IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 84745-7-I |
| Respondent, | |
| | DIVISION ONE |
| v. | |
| | UNPUBLISHED OPINION |
| ELLE BARKSDALE LOE, | |
| Appellant. | |

HAZELRIGG, A.C.J. — Elle Barksdale Loe appeals from her jury conviction for two counts of theft from a vulnerable adult in the first degree and two counts of securities fraud. She asserts that reversal is required based on a number of erroneous evidentiary rulings before and during trial. Loe further contends the trial court erred in the imposition of interest on the restitution award it issued at sentencing. As to the evidentiary issues, we disagree and affirm, however we remand for the court to apply the statutory factors regarding interest on restitution.

FACTS

Elle Barksdale Loe came into contact with Morris Gorelick through her mother, Bonnie Anderson, who had been Morris' live-in caretaker for several years following the death of Morris' wife.[1] After Loe lost her marketing job for a restaurant in 2016, she sought to expand her own pre-existing business and continued to

---

[1] Several people involved with this case share the same last name. We refer to the defendant by her last name, but use first names for several other witnesses and involved parties for the sake of clarity and precision. No disrespect is intended.

work in marketing. In this capacity, she assisted several clients with updating their business branding, producing marketing materials, and assisting with campaigns on social media. After two years, Loe sought to expand her business to include co-marketing deals with reality tv personalities to sell a number of products, including eyewear and sleepwear. Seeking investment capital, Loe approached Morris for funds to expand her business in 2018. At the time, Morris was 97 years old and had owned and operated several businesses over the course of his working life. Morris' daughter, Paula Gorelick, had been present when Loe initially proposed the investment to Morris and had cautioned him not to contribute more than $25,000.

In May 2018, Loe and her then-husband, Trevor Loe, drafted a contract to clarify that, in exchange for his $100,000 investment, Morris would be entitled to 15 percent of all sales until he had been repaid 125 percent of his investment amount. After that, he would receive 2.5 percent of sales for three years. The contract further established that, if Morris did not receive the 125 percent return on his investment within three years, he would receive 20 percent equity ownership in the business. Trevor helped prepare the contract and is identified in the document as the chief financial officer (CFO) of the company, but was not present when Loe and Morris signed it.[2] Morris had granted powers of attorney to Paula, and she had been helping him with various financial tasks for some time, but she did not review the initial contract between Loe and her father. Morris wrote Loe a check for $100,000, dated May 16, 2018, to help get her business going. Loe did

---

[2] Trevor was offered immunity from prosecution in exchange for his testimony at trial.

take steps to launch the new venture; she met with suppliers and contracted with various web designers, photographers, stylists, and models. These efforts resulted in a few social media pages, web pages, and a bus wrap advertising one of the products. However, sales ended in August 2018.

Shortly thereafter, Loe offered Morris a promissory note in exchange for a loan to her and Trevor in the amount of $210,000. Morris explained that he would not be making any loans to Loe, because he was only interested in making investments. In September 2018, Loe and Morris executed a second contract which deemed Morris a silent partner to Loe in exchange for his $450,000 investment and entitled him to 20 percent of the annual profit. It further noted that Morris would receive a 47 percent equity ownership if his investment was not repaid within four years. This contract also listed Trevor as the CFO, but he did not sign the agreement. Trevor filed for divorce from Loe shortly before the second contract was executed.

The following month, Morris opened a joint credit card with Loe. During his call to the credit card company, the representative heard a woman in the background who they believed was coaching Morris through the request. The representative contacted the Bellevue Police Department (BPD) to report their concerns. After BPD visited Morris at home to investigate, Loe's mother contacted Paula to advise that she may receive a phone call from police, but advised her to "just say it's alright." Morris told Paula substantially the same thing, so that is what she later told police. Paula had discussed earlier concerns about the contracts with her brother, Brian Gorelick, and in December 2018, Morris' friend and

- 3 -

investment advisor, James Parsons, prepared a financial power of attorney (POA) document that immediately established Paula as her father's attorney in fact. In the event that Paula resigned from that role, authority would fall to Brian and then to Morris' other son, Kenneth Gorelick. Parsons, a business attorney who had known Morris for many years, had no concerns about Morris' capacity to execute the POA.

Morris received a check for $15,000 from Loe in February 2019 with a memo that suggested the check was for his share of the business profits for "QTR 6." Business records would later establish that the venture had only generated $9,800 by the time the check was issued, which did not comport with the amount Morris received from Loe based on the terms in the contract. Paula later said that Morris declined to deposit the check so that Loe could continue to use the funds to build her business.

By May 2019, Morris' children had changed their responsibilities under the POA; Paula resigned and Kenneth took over as attorney in fact. Kenneth was concerned about the terms of the agreements with Loe and the amounts Morris was contributing to her business. He e-mailed Loe several times with questions about the business relationship and investment transactions. Loe eventually stopped responding. Later that month, Kenneth recorded a conversation with his father, with Morris' express permission, during which they discussed the family's concerns about Morris' transactions with Loe. The day after this recorded conversation, Anderson took Morris to Trevor's apartment where Loe typed what was purported to be a transcript of Morris' oral statements. While the document is

titled "Elle Barksdale & Company LLC Governing Documents," much of the content consisted of editorial commentary on the concerns raised by Morris' children, Loe's intentions regarding the business and her relationship with Morris, and other matters not typically associated with the governance of a business entity. It did, however, indicate that Morris gave Loe another $350,000 for "working capital" and specifically noted that she was permitted to use these funds

> for to [sic] pay for anything she deems necessary to help aid her business in continued / further success. Elle referenced needing to pay for a billboard or two, payroll for up to 4-5 employees full time or part time and office related expenses including rent, insurance, travel credit card payments, and existing debt or upcoming debt.

The document was notarized as to Loe's signature only, though it does appear to contain Morris' signature as well. Shortly after the check for $350,000 was issued to Loe, Kenneth took steps to freeze Morris' accounts.

An attorney for Kenneth made a report to BPD in June 2019 and Detective Ray Lofink began investigation of the claims against Loe. Lofink noticed significant memory issues between his two interviews of Morris, conducted approximately one week apart. He obtained a warrant to seize Loe's bank account. In mid-June, Anderson, who was aware of the existing POA, made a same-day appointment with an attorney who drafted a new POA that gave Anderson immediate and unlimited power over Morris' accounts, including the right to gift funds to non-family members and to pay herself for serving as his attorney in fact.

Morris had been administered a cognitive screening assessment by his primary care provider on June 18, 2019, but declined the recommendation for further testing. By this time, Adult Protective Services (APS) also opened an

investigation. In early July 2019, Kenneth, Paula, and Morris had a tense conversation in the kitchen at Morris' house where they again discussed the transactions with Loe. Anderson was also present for parts of the conversation, though she was repeatedly asked to leave. Kenneth recorded this conversation. Morris insisted that Loe's venture just needed more time before he would see a return on his investments, but he was unable to articulate what the business was and appeared surprised to learn that he had contributed nearly $900,000 to date.

APS investigators had Morris complete a few different cognitive tests in the early stage of their investigation and eventually requested assignment of a more experienced investigator to his case. In late July, Morris was administered a SLUMS[3] test as part of a comprehensive APS assessment and his score suggested he was experiencing significant cognitive impairment. Morris scored 8 out of 30 and the evaluator noted "a score below 20 indicates dementia" and that Morris had likely been struggling for months, if not years. Morris passed away in November 2019 while the investigation was ongoing.

On February 14, 2020, the State charged Loe with three counts of theft from a vulnerable adult in the first degree and two counts of securities fraud, all of which carried allegations of special aggravating factors. The State asserted that all of the charged crimes were major economic offenses or a series of such offenses, as defined by statute, and, as to the securities fraud charges, that Loe had committed those crimes knowing that Morris was a particularly vulnerable victim. On July 13, 2022, the State filed an amended information that changed the charging period set

---

[3] "SLUMS" is the Saint Louis University Mental Status exam, a cognitive test designed to assess the subject's mental capacity.

- 6 -

out in counts 2 and 3 from September 2 to September 12 and May 6 to May 16, respectively.

Loe moved pretrial to exclude the recording of the conversation at Morris' kitchen table from early July 2019 based on purported violations of her right to confrontation. At argument on the motion, Loe further averred that the recording violated Anderson's privacy rights. The court agreed in part and admitted a redacted version of the recording that omitted portions where Anderson was present. During trial, Loe sought admission of a PowerPoint[4] presentation designed to accompany the testimony of her defense expert, Lorraine Barrick, as well as several other exhibits. The court raised concerns about Barrick's ability to lay an adequate foundation for some of the proposed exhibits based on its assessment that some of her knowledge about the materials was based only on hearsay. While the judge allowed many of the proffered exhibits for illustrative purposes, she excluded several, including a receipt, a model release, and a contract that Barrick could not authenticate.

The jury acquitted Loe of one of the three counts of theft from a vulnerable adult in the first degree (Count 1), but convicted her on the two remaining counts (Counts 2 and 3) and both counts of securities fraud (Counts 4 and 5). It further found by special verdict the aggravating factor that all four of the crimes of conviction were major economic offenses or a series of offenses and, on Counts 4 and 5, Loe knew or should have known that Morris was particularly vulnerable or incapable of resistance. The court calculated Loe's offender score as a 3 on all

---

[4] A slide show presentation application by the Microsoft Corporation.

counts and, despite the jury's findings of aggravating factors, imposed standard range sentences on all counts: 26 months in prison each on Counts 2 and 3 and 12 months each on Counts 4 and 5. It further ordered that all sentences would run concurrently to each other and to another felony conviction under a separate King County cause number. The court also imposed 12 months of community custody and a 10-year no contact order prohibiting Loe from contact with Kenneth or Paula.

The court ordered Loe to pay then-mandatory legal financial obligations of a $100 DNA collection fee and $500 victim penalty assessment, awarded $900,000 in restitution to Morris' estate, and the judgment and sentence (J&S) contained form language that imposed interest on the restitution award. Loe then timely appealed. After Loe's appeal was accepted by this court and she had been appointed appellate counsel, the trial judge entered an order that remitted the legal financial obligations due to Loe's indigency, and denied a number of other motions that appear to have been filed after sentencing, but were not included in the record before us.[5]

## ANALYSIS

Loe avers the trial court committed reversible error when it admitted the redacted recording of the kitchen table conversation with Morris, permitted Lofink to testify as to his opinion about the February 2019 check from Loe to Morris, and

---

[5] The other motions were for review of the denial of Loe's application for a Department of Corrections community placement option and for a bond pending appeal. Another request in the motion was less clear; in case the intent of Loe's motion to remit legal financial obligations was intended to also capture the restitution award, the court denied such relief as well.

Most of these topics were previously addressed in the defense sentencing memo and effectively ruled on with the imposition of the sentence. However, the trial court appears to have treated Loe's postsentencing motions as motions for clarification.

excluded portions of the PowerPoint presentation Loe sought to admit through her defense expert. She also presents a cumulative error argument and asserts that the court failed to properly consider the relevant statutory factors when it imposed interest on the restitution award. We consider each challenge in turn.

I.      Admission of Recorded Conversation

Loe first assigns error to the trial court's ruling to admit a recorded conversation between Kenneth, Paula, Morris, and Anderson, alleging that its admission violated the state privacy act, RCW 9.73.050. She specifically argues that Morris had a reasonable expectation of privacy in his home and that, in violation of the act, Morris' consent to the recording was not captured by the recording itself. In response, the State asserts that while Loe argued in the trial court that the recording of the incident the parties referred to as the kitchen conversation violated the privacy act as to Anderson, her contention regarding Morris' rights under the privacy act are presented for the first time on appeal. It further asserts that, having failed to preserve that error in the trial court, we should not reach this issue because Loe has not demonstrated that consideration for the first time on appeal is proper under RAP 2.5.

A.      Standing and Preservation

As a preliminary matter, though the trial court expressed doubt at the time of the hearing, Loe has standing to challenge the admission of the conversation even if she was not a participant. The State does not dispute this point. Our state privacy act explicitly says that "[a]ny information obtained in violation of RCW

9.73.030 . . . shall be inadmissible in any civil or criminal case in all courts of general or limited jurisdiction in this state." RCW 9.73.050. Our Supreme Court has held that the plain language of the statute allows defendants to challenge conversations even if they were not a party to the conversation.

> [T]he statute precludes the use of illegally obtained information "in any civil or criminal case"—whether it is the criminal prosecution of the participant in the conversation, or the prosecution of [their] codefendant. The statutory language and legislative history [of RCW 9.73.050] reveal that "the legislature's primary purpose . . . was the protection of the privacy of individuals from public dissemination, even in the course of a public trial, of illegally obtained information.

*State v. Williams*, 94 Wn.2d 531, 545-46, 617 P.2d 1012 (1980) (one alteration in original) (first quoting RCW 9.73.050; and then quoting *State v. Wanrow*, 88 Wn.2d 221, 233, 559 P.2d 548 (1977) (plurality opinion)). Thus, Loe's challenge is not barred based on standing.

Nonetheless, the State urges this court to decline to reach this assignment of error and asserts that Loe's objection in the trial court failed to preserve her argument as to Morris' rights under the privacy act. It further contends that the issue is waived as Loe did not present argument under RAP 2.5 to demonstrate that this is a manifest constitutional error that would allow this court to consider it for the first time on appeal. The State's arguments on this issue fail.

First, Loe is not arguing a constitutional right and relying on RAP 2.5(a)(3), but is arguing a statutory right under RCW 9.73.050. More critically, she expressly asserted that the primary barrier to admission of the recording was the fact that neither Kenneth's notice of recording nor Morris' or Paula's consent were captured

on the recording itself.  This argument, alone, is sufficient to preserve the error for review.

In her motions in limine, Loe claimed that Morris' statements to Kenneth were "testimonial in nature" and, accordingly, inadmissible against her based on the confrontation clause of the Sixth Amendment to the United States Constitution. She described the kitchen table conversation in great detail and asserted that Kenneth's exchanges with Morris were "more structured as a typical interrogation" than the law enforcement interviews.  As the party seeking to introduce the recording of the kitchen table conversation, the State filed a written motion to admit the evidence under the privacy act.  In its motion, the State laid out controlling authority establishing that chapter 9.73 RCW applies only to conversations that are private where each participant has a reasonable expectation of privacy.  With regard to the kitchen table conversation, the prosecutor argued that Kenneth, Morris, and Paula consented to the recording and that, while it made no such assertions as to Anderson, the conversation was not private.  Loe filed a "Defense Reply to State's Privacy Act and Confrontation Clause Motions" that did not cite or analyze the privacy act and, as with her motions in limine, solely focused on the confrontation clause.

Soon thereafter, the court heard argument on the privacy act issue.  Loe's counsel began her presentation of the defense objection by noting that Kenneth asserted that he notified Morris and Paula about the recording, but that notice was not captured on the recording itself.  Counsel then moved on to concerns about Anderson's privacy rights.  Loe argued that the conversation was private because

it occurred in Morris' home and addressed a topic that was "not common or public knowledge." While Loe's briefing did not squarely address the privacy act, careful review of the report of proceedings establishes that she made sufficient argument as to the parties and the factors regarding reasonable expectation of privacy such that the challenge is preserved.

B.     Applicability of Privacy Act

We review alleged violations of the privacy act de novo. *State v. Kamara*, 28 Wn. App. 2d 903, 909, 539 P.3d 48 (2023), *review denied*, 2 Wn.3d 1031 (2024). "[S]ince whether the 'facts' are encompassed by the statutory protections presents a question regarding statutory interpretation, de novo review is the appropriate standard of review." *Id.* (alteration in original) (quoting *State v. Kipp*, 179 Wn.2d 718, 728, 317 P.3d 1029 (2014)). Private conversations shall not be recorded without the consent of the parties to those conversations. RCW 9.73.030(1)(b). That consent does not have to be explicit, it can be implied in several ways. *State v. Smith*, 189 Wn.2d 655, 665, 405 P.3d 997 (2017).

> "A party is deemed to have consented to a communication being recorded when another party has announced in an effective manner that the conversation would be recorded." Also, "a communicating party will be deemed to have consented to having [their] communication recorded when the party knows that the messages will be recorded."

*Id.* (citations omitted) (quoting *State v. Townsend*, 147 Wn.2d 666, 675-76, 57 P.3d 255 (2002)). Whether the privacy act applies is a question of law that rests on the particular facts of the case. *Townsend*, 147 Wn.2d at 673. In determining whether a conversation is private, we look to the subjective intent of the parties and may

- 12 -

consider other factors, including the "duration and subject matter of the communication, the location of the communication, and the presence of potential third parties." *State v. Roden*, 179 Wn.2d 893, 900, 321 P.3d 1183 (2014).

The court's decision on this matter turned on the applicability of the privacy act to each of the involved parties. Kenneth had clearly consented to the recording as he was the one who recorded it. The court properly noted that there is no requirement that the announcement occur on the recording if there is consent by the parties. However, because Anderson was not present when this announcement occurred, and no such notice was provided once recording began, the court ruled that her portion of the conversation was precluded under the privacy act. The judge further found that Anderson, a live-in caretaker, had a reasonable expectation of privacy in the kitchen of the home where she worked and resided.

The State's motion for admission of the kitchen table conversation relied substantially on Kenneth's assertion that he had notified both Morris and Paula and that they consented prior to the start of the recording. However, the court's ruling that the portions of the conversation involving only Kenneth, Morris, and Paula were admissible was conditional. The judge stated that "if there is consent, then the requirement that the announcement be on the recording is not necessary." She made a preliminary ruling based on the assertions of the parties, but it rested on evidence to be introduced at trial. Loe did not object to this ruling, likely because it was conditional and the ultimate determination would be made after testimony about Morris' consent.

1.      Evidence of Consent

The State's motion to admit the kitchen table conversation expressly asserted "prior to the recording of the conversation, Kenn[eth] told Morris and Paula that he was recording the conversation, and both affirmatively consented to the recording." However, at trial, the State only asked Kenneth, "[D]id your dad know he was being recorded?" to which Kenneth simply responded, "He did." The State did not ask whether Morris consented to the recording, nor did Kenneth offer such information. Similarly, Paula was never asked about Kenneth's announcement prior to the recording or whether she or her father consented. The State failed to elicit the testimonial evidence that would have supported the preliminary ruling on the admissibility of the kitchen table recording. More critically, Loe failed to object once it became clear that there was no evidence of consent to support that conditional ruling. Failure to seek a final ruling waives any claim of error for appeal. *See State v. Riker*, 123 Wn.2d 351, 369, 869 P.2d 43 (1994); *State v. Carlson*, 61 Wn. App. 865, 875, 812 P.2d 536 (1991).

2.      Expectation of Privacy

As an alternate basis for admission as an exception to the privacy act, the State asserted that the parties did not have any reasonable expectation of privacy. While the court considered Anderson's expectation of privacy in Morris' home, it did not engage in such analysis as to Morris and Paula. The State's motion to admit the recording cited *State v. Babcock,* 168 Wn. App. 598, 279 P.3d 890 (2012) for the proposition that the privacy act necessarily only applies to conversations that are private. In *Townsend*, our Supreme Court held that courts must determine

- 14 -

whether the parties manifest a subjective intent that the conversation is private and then, whether that expectation is reasonable. 147 Wn.2d at 673. During argument on the pretrial motion, the State properly cited the factors under *State v. Clark* that are used to answer those two questions: the subject and duration of the communication, location, presence of third parties, and the role of the nonconsenting party in relation to the consenting party. 129 Wn.2d 211, 224-27, 916 P.3d 384 (1996).

While no one factor is determinative, the relationship between the parties here is particularly salient. At this point in the events leading up to the filing of criminal charges, Kenneth and Paula's position was openly adverse to that of Anderson because of her relationship to Loe and involvement in the various dealings, while Morris was at the center of the conflict. This can be demonstrated by a brief overview of events that preceded the kitchen table conversation.

- Early in May 2019, Kenneth e-mailed Loe with questions regarding her business relationship with his father. This exchange clearly escalated and became increasingly adversarial until Loe ceased responding.[6]

- At the end of May, Paula stepped down as Morris' attorney in fact and Kenneth assumed the role, consistent with his increasing involvement in the situation.

---

[6] Kenneth's first e-mail, sent on May 5, sought clarification about the contract and payment schedule. Kenneth's attorney in California, Lee Blackman, also requested the operating agreement from Loe in an e-mail dated May 6. Loe's reply was not responsive to these requests.

Kenneth e-mailed Loe again on May 22 to request the return of the money after Morris had written the $350,000 check, but offered that he would release the funds to Loe if she addressed his concerns. Loe then replied the same day and stated that she was "extremely confused by all that is going on" and she "never forced [Morris] to do anything out of his comfort zone." She continued that she felt like she was being bullied and falsely accused, and explained, "I feel like you are turning many things into something they are not and I will have my Attourney [sic] step in at this point before I do anything else" and that she "never thought this was going to be some huge issue" and was "extremely upset with this and the way [she was] being treated."

Kenneth's next email stated that he was "not trying to point fingers" and was "only trying to protect" his father, but reiterated a request for the return of Morris' money and to provide a repayment schedule. Kenneth sent two more emails after that, but Loe did not reply.

- 15 -

- Also in May, Kenneth retained Washington counsel, Quentin Wildsmith, at the suggestion of his California attorney, Lee Blackman.

- Wildsmith then contacted both APS and BPD.

- Kenneth took steps to freeze Morris' accounts to prevent Loe from gaining access to more money.

- Wildsmith initiated a civil suit to recover money from Loe.

- On June 5, 2019, Lofink was assigned to the case by BPD.

- On June 11, Lofink visited Morris and interviewed him regarding the allegations against Loe while Paula was present.

- One week later, on June 18, Lofink visited Morris again. According to Lofink, Anderson tried to prevent the two from meeting. Lofink returned after Anderson had left and Morris consented to a second interview.

- On June 26, an APS investigator, Paige Law, visited Morris. Morris asked for Paula to be present and Law administered a cognitive test to Morris, the results of which suggested moderate impairment.

- The kitchen table conversation between Kenneth, Paula, and Morris occurred on July 2, 2019. Anderson was also present and, at times, interrupted, despite being repeatedly asked to leave.

The duration of the kitchen table conversation does not provide much direction in terms of admissibility. Similarly, the fact that it occurred in Morris' kitchen cuts both ways; while it was his home and Anderson also resided there as his caretaker, the conversation took place in a shared area of a residence with a lower expectation of privacy than a bedroom, office, or bathroom.

The chronology of events leading up to the kitchen table conversation establishes that the involved parties were at odds. Loe conceded at argument on the motion that "[a]ll four people were aware of the allegations, aware of the police investigation, and APS investigation going on in the background," though she also argued "that this was not common or public knowledge at this point." The subject

of the conversation, put bluntly, was whether Loe and her mother, Anderson, had been financially exploiting Kenneth and Paula's elderly father. And, despite Loe's arguments to the contrary, the filing of official reports to government agencies like BPD and APS places these concerns squarely into the public sphere. Formal investigations were underway and Kenny and Paula had initiated a civil suit against Loe to attempt to recover the funds Morris had provided to her. The Gorelicks clearly did not want Anderson involved in the conversation as they can be heard repeatedly telling her to leave. These factors, as a whole, support a conclusion that this conversation was not subject to the privacy act because the conversation was not private; given the nature and circumstances of the conversation there was no reasonable expectation of privacy. The trial court did not err when it ruled to admit the redacted recording of the kitchen table conversation.

II.    Opinion Testimony

In her second assignment of error, Loe asserts that the trial court improperly allowed Lofink to offer opinion testimony regarding the check Loe provided to Morris pursuant to the profit-sharing agreement. We review the evidentiary decisions of the trial court for abuse of discretion. *State v. Quaale*, 182 Wn.2d 191, 196, 340 P.3d 213 (2014). "On appeal, a party may not raise an objection not properly preserved at trial absent manifest constitutional error." *State v. Powell*, 166 Wn.2d 73, 82, 206 P.3d 321 (2009) (plurality opinion); RAP 2.5(a)(3). Opinion testimony from lay witnesses is not per se inadmissible, but it is limited to "those opinions or inferences which are . . . rationally based on the perception of the witness." ER 701. "Testimony in the form of an opinion or inferences otherwise

admissible is not objectionable because it embraces an ultimate issue to be decided by a trier of fact." ER 704. When determining the admissibility of opinion testimony, the trial court must consider certain factors, including "(1) the type of witness involved, (2) the specific nature of the testimony, (3) the nature of the charges, (4) the type of defense, and (5) the other evidence before the trier of fact." *State v. Demery,* 144 Wn.2d 753, 759, 30 P.3d 1278 (2001).

The testimony at issue occurred during Lofink's direct examination by the State:

[State]: Okay. How is that check relevant to your investigation, detective?

[Lofink]: Well, the check, itself, has notations indicating that it's kind of a profit-sharing thing for the investment. And so, to receive a check for $15,000 when you're getting 15 percent would imply a $100,000 worth of sales.
     But we know by analyzing the Stripe[7] records that it was only $9,800. So my opinion is that check was misleading. It was not accurate.

[Defense]: Objection, provides an opinion outside the scope of his expertise.

THE COURT: I'm going to overrule. The answer can stand.

Loe's objection was that the statement regarding the check was outside the scope of Lofink's area of expertise. However, in briefing Loe now avers that Lofink's testimony was an impermissible opinion on guilt, which only the jury could decide. She specifically asserts that this implicates her right to a fair jury trial.

In response, the State argues that we need not reach this error because the objection in the trial court was based on ER 702, which governs opinions of

---

[7] A digital payment processing application.

qualified experts, and ER 703, which addresses types of information on which an expert may rely. However, Loe's challenge on appeal relies on ER 701, opinions by lay witnesses, and ER 704, which prohibits opinion testimony on the ultimate issue to be decided by the trier of fact. Case law is clear that, in order to preserve an issue for appeal, such argument must be presented in the trial court.

> We adopt a strict approach [to issue preservation] because trial counsel's failure to object to the error robs the court of the opportunity to correct the error and avoid a retrial. We will not reverse the trial court's decision to admit evidence where the trial court rejected the specific ground upon which the defendant objected to the evidence and then, on appeal, the defendant argues for reversal based on an evidentiary rule not raised at trial.

*Powell*, 166 Wn.2d at 82-83 (citation omitted). Because Loe's objections under ER 701 and 704 were not presented in the trial court, we decline to consider them now.[8]

III.     Exclusion of Defense Exhibits

Loe next assigns error to the exclusion of several exhibits she had intended to admit through the testimony of her defense expert, Lorraine Barrick, a certified public accountant qualified in financial forensics and as a business appraiser. The trial court's primary concern with these exhibits was that Barrick could not lay an adequate foundation because her knowledge of the exhibits was based on hearsay, specifically statements Loe made to Barrick. Among the items proffered but excluded was defense exhibit 134 (Exh. 134), a packet of product and

---

[8] The State also notes in briefing that Loe did not attempt to satisfy RAP 2.5(a)(3) in order for this challenge to be considered for the first time on appeal as a manifest error affecting a constitutional right. Loe did engage in the test to establish manifest constitutional error, but not until her reply brief. It is well established that we do not consider arguments raised for the first time in reply. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

packaging mockups, logos, examples from photoshoots, and other marketing materials. The court also considered, and excluded, a receipt from the eyewear supplier, the branding contract with Katrina Taylor, a model release form, and other documents. The court did admit for illustrative purposes a modified version of Loe's PowerPoint that contained materials similar to those excluded as part of Exh. 134: product mockups, branding materials, photoshoots, and the bus wrap. Loe asserts that exclusion of these materials was improper because Barrick relied on them in forming her conclusions regarding the state of Loe's business venture.

We review the admission of evidence related to expert testimony for abuse of discretion. *State v. Gentry*, 125 Wn.2d 570, 588, 888 P.2d 1105 (1995). An abuse of discretion has occurred only if the trial court's decision was "'manifestly unreasonable or based on untenable grounds or decisions.'" *In re Pers. Restraint of Morris*, 176 Wn.2d 157, 169, 288 P.3d 1140 (2012) (plurality opinion) (quoting *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995)). The opinion testimony from expert witnesses is governed by ER 702, which establishes,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In arriving at an opinion, an expert may rely on evidence that is otherwise inadmissible, provided it is of a type relied on by experts in their particular field. ER 703. "The expert *may* testify in terms of opinion or inference and give reasons therefor without prior disclosure of the underlying facts or data, unless the judge requires otherwise. The expert may in any event be required to disclose the

underlying facts or data on cross examination." ER 705 (emphasis added). The trial court can "exclude inadmissible information on which an expert has relied to prevent an expert's opportunity to explain the basis of an opinion from merely becoming 'a mechanism for admitting otherwise inadmissible evidence'" or to avoid the rules of evidence entirely. *State v. Caril*, 23 Wn. App. 2d 416, 427, 515 P.3d 1036 (2022) (quoting *State v. Anderson*, 44 Wn. App. 644, 652, 723 P.2d 464 (1986)), *review denied*, 200 Wn.2d 1025, *cert. denied*, 144 S. Ct. 125 (2023).

Loe asserts that we should review the trial court's interpretation of the rule de novo. However, without directly asserting such a claim, Loe's briefing leans into the test for a purported denial of the right to present a defense. Without such a challenge squarely before us, we decline to engage in that analysis as to do so would result in application of an improper standard of review. Where nothing in the record suggests that the trial court has misinterpreted the rules of evidence, we review the decision to admit for abuse of discretion. *Gentry*, 125 Wn.2d at 588. Here, the trial court's evidentiary ruling was within its discretion for two reasons. First, ER 705 allows an expert witness to testify as to the basis of their opinion, but it does not require that the judge admit the materials that provide that basis. Second, a comparison between the evidence that was excluded and that which was allowed establishes that Barrick was able to present a variety of materials to illustrate the basis of her opinion, just not all of the materials that Loe may have desired.

Loe misses a crucial distinction regarding the interaction of the evidentiary rules regarding experts, their opinions, and their testimony; the expert is allowed

to form an opinion based on inadmissible evidence, but this rule does not mandate the subsequent admission of that evidence to the jury.

> At other times, as here, the party offering the expert may seek to ask the expert on direct examination to relay inadmissible facts or data on which the expert has relied in forming opinions. When inadmissible facts or data are offered under ER 705, the trial court should "determine under ER 403 whether to allow disclosure of inadmissible underlying facts based upon whether the probative value of this information outweighs its prejudicial or possibly misleading effects."

*Caril*, 23 Wn. App. 2d at 428 (quoting *State v. Martinez*, 78 Wn. App. 870, 879, 899 P.2d 1302 (1995)).

The trial court did not abuse its discretion as to this ruling; it permitted Barrick to testify to her overall conclusion, but did not allow her to relate *all* of the information she relied on in reaching that opinion. The jury did not need the excluded items in order to understand how Barrick formed her opinion. The materials Barrick relied on that *were* admitted included ample evidence of Loe's business activities; product and packaging mockups, examples of photoshoots, the promotional bus wrap, as well as financial transactions with suppliers. Further, allowing all of Loe's proffered evidence via the PowerPoint presentation would have exposed the jury to a variety of evidence for which Barrick simply could not lay an independent foundation; specifically, the product and packing mockups, the invoice from the eyewear supplier, and the contract with Katrina Taylor. Relevant to the specific evidence at issue here, admission of business records requires authentication of the records by someone qualified to do so. RCW 5.45.020. Barrick was not involved in Loe's business or in the businesses of the parties with whom Loe was dealing. The only information Barrick had regarding these records

came from inadmissible hearsay statements from Loe herself. Because Barrick could not independently authenticate these records, the trial court properly excluded them.[9]

IV.     Interest on Restitution

Loe requests remand for the trial court to consider waiver of the interest on the restitution pursuant to an amendment to RCW 10.82.090 which directs it to consider the indigency of the defendant, among other factors, before deciding whether or not to impose interest on any restitution imposed.

As a preliminary matter, we must determine if Loe can benefit from a change in the relevant statute because her case was not yet final when the amendment became effective. Both parties rely on cases in the lineage of *State v. Ramirez* which applied statutory amendments regarding legal financial obligations (LFOs) to a defendant whose case was still pending on appeal when the changes went into effect. 191 Wn.2d 732, 747, 426 P.3d 714 (2018). In its brief, the State offers the discussion of *Ramirez* in *State v. Jenks,* 197 Wn.2d 708, 723-24, 487 P.3d 482 (2021), as limiting prospective application "to costs imposed upon conviction." The State asserts this reasoning does not apply to restitution because it is compensation to the victim and "not a cost related to the litigation." However, it is worth noting that *Jenks* addressed the prospective application of statutory amendments to the list of convictions that count towards persistent offender status. 197 Wn.2d at 722. There, our Supreme Court addressed *Ramirez* only to explain that its prospectivity analysis as to LFOs

---

[9] Because Loe has not demonstrated any error with respect to the trial, her claim of cumulative error necessarily also fails.

does not control on questions of reforms to persistent offender status and was inapplicable to Jenks' appeal. More critically, the State's interpretation of "costs" as used in LFO jurisprudence is much less inclusive than that of our Supreme Court.

In *Ramirez*, the trial court had imposed mandatory fees and costs alongside discretionary LFOs, specifically to recover attorney fees, and our Supreme Court granted review "'on the issue of discretionary [LFOs.]'" 191 Wn.2d at 738 (alteration in original). The Supreme Court considered House Bill 1783, which prohibited both the imposition of a previously mandatory filing fee and discretionary LFOs on indigent defendants, and ultimately determined that the amendments applied prospectively to cases pending on appeal when they became effective. *Id.* The opinion variously uses the terms "costs," "discretionary costs," "discretionary LFOs," "LFOs," and "filing fee," to describe the financial consequences it examined. Its prospectivity analysis relied in part on its earlier opinion, *State v. Blank*, 131 Wn.2d 230, 930 P.2d 1213 (1997). The court in *Ramirez* explained that *Blank* "consider[ed] the prospective application of *cost statutes* to criminal cases on appeal." *Ramirez*, 191 Wn.2d at 748 (emphasis added). As the question before it in *Ramirez* also concerned "the court's ability to impose *costs* on a criminal defendant following conviction," the court relied on *Blank* to hold that because the amendments in H.B. 1783 "pertain[ed] to *costs imposed upon conviction* and Ramirez's case was not yet final when the amendments were enacted, Ramirez is entitled to benefit from the statutory change." *Id.* at 749 (emphasis added). The Supreme Court unambiguously accepted review of the question Ramirez' appeal presented regarding "discretionary LFOs" and it explicitly applied the same reasoning underpinning its prospectivity analysis concerning the statutory amendment regarding

the previously mandatory filing fee, to the amendments to discretionary LFOs contained in that same house bill that had amended the filing fee. More critically, read as a whole, it is clear that our Supreme Court recognized the goal of H.B. 1783 was to "address[] some of the worst facets of the system that prevent offenders from rebuilding their lives after conviction" and noted that the changes implemented in that bill included, in addition to those already discussed, elimination of interest on "nonrestitution portions of LFOs," repeated imposition of the DNA collection fee if a sample had previously been provided, and sanctions for nonpayment of LFOs in the absence of a showing of willfulness. *Id.* at 747. Further, it is not lost on this panel that the other key issue addressed in *Ramirez* was the adequacy of the trial court's inquiry when considering the imposition of legal financial obligations on an indigent defendant. *Id.* at 739-46. In short, the State's limited interpretation of *Ramirez* is simply not supported by the inclusive language and express holdings set out in the opinion.[10]

In briefing, the State seeks to distinguish between "the statutory process for ordering costs from the process of restitution," and relies on *State v. Ramos* in support of this position. 24 Wn. App. 2d 204, 520 P.3d 65 (2022), *review denied*, 200 Wn.2d 1033 (2023). However, Ramos was challenging the imposition of restitution, accrued interest, and the victim penalty assessment on the grounds that they violated the excessive fines clauses in the Eighth Amendment to the United States Constitution

---

[10] Despite this court's consistent opinions on this issue, the State stands firm in its belief that we "wrongly rely on . . . *Ramirez*." However, separate from the analysis set out herein, while further review was not sought in *State v. Ellis*, 27 Wn. App. 2d 1, 530 P.3d 1048 (2023) the Supreme Court has denied review in both of the other cases the State claims incorrectly decided this issue. *See State v. Reed*, 28 Wn. App. 2d 779, 538 P.3d 946 (2023), *review denied,* 2 Wn.3d 1035 (2024); *State v. Schultz*, 31 Wn. App. 2d 235, 548 P.3d 549 (2024), *review denied,* 3 Wn.3d 1022 (2024).
The State fails to persuade us to depart from our interpretation of *Ramirez*.

and art. 1, § 14 of the Washington State Constitution. *Id.* at 212. As such, that case is inapposite here.

Loe relies on *State v. Wemhoff*, 24 Wn. App. 2d 198, 519 P.3d 297 (2022), *State v. Ellis*, 27 Wn. App. 2d 1, 530 P.3d 1048 (2023), and *State v. Reed,* 28 Wn. App. 2d 779, 538 P.3d 946 (2023) and their respective references to *Ramirez* for the proposition that a defendant can avail themselves of the prospective benefits of a statute while an appeal is still pending, and remand for the trial court to consider financial burdens on an indigent defendant in light of the changes in the statute is appropriate. In the cases Loe offers on this issue, all of the divisions of this court have interpreted *Ramirez* as authorizing remand to the trial court to apply statutory amendments to restitution and supervision fees for defendants whose cases were still on appeal and therefore not yet final. *Wemhoff,* 24 Wn. App. 2d at 202; *Ellis,* 27 Wn. App. 2d at 15-16.

The recently revised restitution statute grants the trial court discretion in its decision to impose interest on the restitution it orders and expressly notes that while the court may decide against requiring payment of interest on restitution, it must first,

> inquire into and consider the following factors: (a) Whether the offender is indigent as defined in RCW 10.01.160(3) or general rule 34; (b) the offender's available funds, as defined in RCW 10.101.010(2), and other liabilities including child support and other legal financial obligations; (c) whether the offender is homeless; and (d) whether the offender is mentally ill, as defined in RCW 71.24.025. The court shall also consider the victim's input, if any, as it relates to any financial hardship caused to the victim if interest is not imposed. The court may also consider any other information that the court believes, in the interest of justice, relates to not imposing interest on restitution. After consideration of these factors, the court may waive the imposition of restitution interest.

RCW 10.82.090(2).

Here, we adopt Loe's interpretation of *Ramirez* and its progeny and remand for the trial court to consider the statutory factors for waiver of interest on restitution based on its previous finding of indigency. This reading comports with the rulings from other divisions on this issue and is distinguishable from *Ramos* for the reasons discussed above. It also effectuates the stated intent of our Supreme Court in *Ramirez*, that trial courts must consider "whether an individual has the current and future ability to pay" before imposing discretionary financial burdens on defendants. 191 Wn.2d at 750.

Affirmed in part, reversed in part, and remanded for consideration of the statutory factors for waiver of interest on restitution.

Hazelrigg, A.C.J.

WE CONCUR:

Birk, J.

Coburn, J.

- 27 -